**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN AMATO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23 C 0108 |
| | ) | |
| MOTOR WERKS PARTNERS, LP, | ) | |
| U.S. BANK, N.A., and | ) | |
| NISSAN NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jonathan Amato filed suit against Motor Werks Partners, LP (Motor Werks), U.S.

Bank National Association (U.S. Bank), and Nissan of North America, Inc. (Nissan) on

various consumer fraud claims related to his purchase of a used vehicle from Motor

Werks, which was financed by U.S. Bank. Motor Werks and U.S. Bank[1] have moved to

compel arbitration under various agreements that they contend Amato entered into

during his dealings with them. For the reasons stated below, the Court grants the

defendants' motion.

### Background

The following facts are undisputed unless otherwise noted. On June 13, 2022,

Amato purchased a used vehicle from Motor Werks for $159,990.00. When he made

the purchase, Amato signed a Buyer's Order and a Retail Installment Contract (RIC),

---

[1] The Court will refer to Motor Werks and U.S. Bank together as "the defendants" below
but reiterates that Nissan is not a party to the motion to compel arbitration.

each of which contained an arbitration provision.  That provision is set forth on its own page—specifically page five—of both documents and is titled as follows:

**"ARBITRATION PROVISION PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS."**  Second Am. Compl., Ex. 2 at 5, Ex. 3 at 5.  The provision states:

> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim of dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition or this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by court action.

*Id.*  The provision also states, among other things, that it is governed by the Federal Arbitration Act (FAA).

Additionally, page three of the Buyer's Order contains a specific acknowledgment of the arbitration provision, which in turn is set forth on page five.  The acknowledgment states:

> **Agreement to Arbitrate**: By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by court action. See the Arbitration Provision for additional Information concerning the agreement to arbitrate.

*Id.* at 3.  Similarly, page six of the June RIC contains an acknowledgement of the arbitration provision set forth on page five of that document.  The acknowledgment states:

> **You agree to the terms of this contract.  You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it.  You acknowledge that you have read all pages of this contract, including the arbitration provision on page 5 of this contract, before signing below.  You confirm that you received a completely filled-in copy when you signed it**.

2

Second Am. Compl., Ex. 3 at 6.

Amato initialed the bottom of all five pages of the Buyer's Order, including the page containing the arbitration provision. He also signed his full name in two different places on page three of the Buyer's Order, including the acknowledgement section confirming that he had read and agreed to the arbitration provision set forth on page five. Amato also initialed the bottom of all five pages of the June RIC, including the page containing the arbitration provision, as well as the acknowledgement section on page six confirming that he had read and agreed to the arbitration provision set forth on page five. Amato contends, however, that he did not sign or place his initials on the line found just *above* the arbitration provision on page five the June RIC. To summarize, Amato fully executed—either with his full signature or his initials—each page and provision of the June 13, 2022 Buyer's Order *and* the June RIC with one exception: the line just above the arbitration provision on page five of the June RIC.

Amato took possession of the vehicle on or about June 18, 2022 and alleges that he began experiencing mechanical issues with it shortly thereafter. On July 10, 2022, the vehicle's battery failed. On July 19, 2022, various repairs were made to the vehicle that were covered by Nissan's factory warranty.

On or around August 18, 2022, Amato was informed that the loan application he had made to finance his purchase had been denied by Chase Bank. As a result, Amato agreed to increase his down payment by $25,000, and he then secured alternate financing through U.S. Bank. The terms of this financing arrangement were memorialized in another RIC dated August 29, 2022. Second Am. Compl., Ex. 7. Importantly, the August RIC contained—again on page five—an arbitration provision

virtually identical to those found on page five of the June Buyer's Order and the June RIC. It also contained, on page six, a virtually identical acknowledgment provision confirming that Amato had read and agreed to the entire contract, including the arbitration provision set forth on page five. Each page of the August RIC contains a signature that the defendants contend is Amato's. But Amato contends—for the first time in his response to the defendants' motion to compel arbitration—that the purported signatures on the August RIC are forgeries[2] and that he did not sign *any* part of the August RIC. He also contends, for the first time in his response, that he did not receive a copy of the allegedly forged August RIC until November 10, 2022.

On October 1, 2022, the vehicle's powertrain and wheels seized. Nissan advised Amato that repairs to the vehicle would not be covered by the factory warranty; it contended that the damage was caused by aftermarket parts. On October 11, 2022, as required by the August RIC, Amato began making monthly payments to U.S. Bank in the amount of $1,363.41. From November 10, 2022 through at least May 10, 2023, U.S. Bank automatically withdrew this amount from Amato's account pursuant to a recurring payment schedule that Amato set up in September 2022.

On December 27, 2022, Amato sent a notice to Motor Werks in which he stated he was revoking his acceptance of the vehicle due to it being "substandard and non-conforming." Pl.'s Resp., Ex. D. In this communication, he also demanded "return of

---

[2] Specifically, Amato contends that the "the August [RIC] contains a <u>starkly</u> contrasted version of [his] purported signature from the one appearing on the June Buyer's order—it is much smaller, is illegible, and the letters of [his] name are entirely indecipherable." Pl.'s Resp. at 4-5. Amato attached as an exhibit to his response an affidavit in which he explains his statement that the signatures on the August RIC were not made by him. He includes in that affidavit a photo of his driver's license, which he says contains his real signature.

[his] entire down payment, payoff of the amounts outstanding which are due under the retail installment contract and a refund of any amounts furnished pursuant to the payment schedule thereunder." *Id.* (emphasis added). As previously noted, Amato continued to make regular payments to U.S. Bank for several months following his revocation letter.

On January 9, 2023, Amato filed the present lawsuit. Amato attached the June Buyer's Order and the June RIC to the original complaint. On January 22, 2023, Amato filed his first amended complaint reasserting the same allegations as those in his original complaint and again attaching the June Buyer's Order and the June RIC. On March 1, 2023, Amato filed his second amended *verified*[3] complaint, this time attaching the August RIC as the operative financing contract, referencing its terms, and alleging that the finalized purchase date of the vehicle was August 29, 2022—the date listed on the August RIC.

On March 15, 2023, the defendants moved to stay the proceedings and compel arbitration of Amato's claims. On March 31, 2023, Amato filed a corrected second amended verified complaint, again reasserting virtually the same allegations and attaching the June Buyer's Order, the June RIC, and the August RIC. This fourth version of the complaint is the operative complaint in this case.

In his corrected second amended verified complaint, Amato alleges—among other things—that Motor Werks made misrepresentations and/or omissions of material fact concerning the vehicle's condition and merchantability. He also asserts claims for

---

[3] Amato verified the second amended complaint verified via a declaration under penalty of perjury attesting to the truth of the allegations within it and to the authenticity of the exhibits attached to it.

revocation of acceptance and conversion. Amato asserts these same claims against U.S. Bank—which financed the purchase—under the Federal Trade Commission's Holder Rule, 16 C.F.R. § 433.2. Finally, Amato alleges that Nissan breached its obligation under the vehicle's standard warranty to repair the vehicle.

On July 25, 2023, the Court held oral argument on the defendants' motion to compel arbitration and took the motion under advisement.[4]

### Discussion

"The [Federal Arbitration Act] provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). "As the Supreme Court repeatedly has emphasized, arbitration is a creature of contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016). "[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Whether an agreement to arbitrate has been formed is a question governed by state law. *Sgouros*, 817 F.3d at 1034. The parties appear to agree that Illinois law governs both sets of the alleged agreements at issue in this case.

Because arbitration is a matter of contract, "a party cannot be required to submit

---

[4] In their reply, the defendants ask the Court to strike Amato's response to their motion to compel because he was not granted leave to file a brief in excess of fifteen pages under Local Rule 7.1 and failed to include a table of authorities in his brief. On July 6, 2023, the Court granted Amato leave *nunc pro tunc* to file an enlarged brief and a table of authorities, so the defendants' contention has been rendered moot.

to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). When a party opposes a motion to compel arbitration on the basis that, factually, there is no binding agreement to arbitrate—and if there are genuinely disputed issues of fact regarding the existence of such an agreement—the Court must order a trial on that limited question. 9 U.S.C. § 4. But the party opposing arbitration bears the burden of "identify[ing] a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 735 (7th Cir. 2002). Just as with motions for summary judgment, in deciding whether there is a genuine issue of material fact for trial in this context, "all justifiable inferences are to be drawn in [] favor" of "the party opposing compelled arbitration." *Id.*

As previously noted, there are two sets of agreements that the defendants contend require Amato to resolve this dispute through arbitration: the June agreements (namely, the June Buyer's Order and the June RIC, both of which contain an agreement to arbitrate) and the August RIC (which also contains an arbitration provision).[5] Amato contends that no binding agreement to arbitrate was formed between the parties in connection with either of these transactions.

## A.    The June Buyer's Order and the June RIC

In his response to the defendants' motion to compel, Amato raised two

---

[5] Although the defendants stated at some points during oral argument—and in their reply brief—that they are not seeking to compel arbitration on anything other than the August RIC, that position is inconsistent with many of the arguments that they advanced both in their opening brief, and at *other* points in their reply brief and during oral arguments. For completeness, the Court will consider both sets of transactions and whether either, or both, resulted in a binding agreement to arbitrate.

challenges to their contention that the June Buyer's Order and the June RIC contain enforceable and binding arbitration provisions. First, he contended that the arbitration provision in the Buyer's Order is not binding because of a failure of a condition precedent, namely, a properly assigned RIC (this contention relates to the turn-down of financing by Chase Bank). Second, Amato contended that the fact that he did not sign the line above the arbitration agreement in the June RIC created a conflict between it and the fully signed Buyer's Order which, under a conflict provision in the Buyer's Order, must be resolved in favor of the June RIC. In other words, he contended that the June RIC's unsigned arbitration provision supersedes the signed arbitration provision in the June Buyer's Order.

Amato expressly abandoned this argument during oral argument on the motion and conceded that the June Buyer's Order—including the arbitration provision—was operative. The Court will therefore turn to Amato's second contention regarding the inconsistencies between the Buyer's Order and the June RIC.

The June Buyer's Order contains a conflict provision that states: "In the event that any of the terms and conditions of this Agreement are inconsistent with the terms and conditions of any retail installment agreement between Purchaser and Seller, the terms of such retail installment agreement shall apply." Second Am. Compl., Ex. 1 at 4, ¶15. Amato contends that he did not sign or initial the line above the arbitration provision of the June RIC and that this creates an inconsistency in "the terms and conditions" of the Buyer's Order, which he did sign. Thus, he contends, the June RIC controls, and there is no binding obligation to arbitrate.

The defendants contend that the fact that Amato's initials are missing from that

8

single section of the June RIC does not by itself create a conflict between the two agreements. The Court agrees. Amato signed or initialed each of the six pages of the June RIC—*including at the bottom of a page that contained only the arbitration provision*. That page appears as follows:



Second Am. Compl., Ex. 3 at 5. Perhaps more importantly, it is undisputed that Amato signed the acknowledgement on page six specifically confirming that he had read and agreed to *all* terms of the contract, "including the arbitration provision on page 5." *Id.* at 6.

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read all pages of this contract, including the arbitration provision on page 5 of this contract, before signing below. You confirm that you received a completely filled-in copy when you signed it.

RETAIL INSTALLMENT CONTRACT

Buyer Signs X _____  Date 06/13/2022  Co-Buyer Signs X ___ N/A ___  Date N/A

Buyer Printed Name JONATHAN MOHR AMATO ___  Co-Buyer Printed Name N/A

If the "business" use box is checked in "Primary Use for Which Purchased": Print Name ___ N/A ___  Title N/A

In an analogous case, the Seventh Circuit held that "even if [the court] limit[ed] [its] review to the one page that [the plaintiff] signed, it [was] impossible to avoid the conclusion that he agreed to arbitration." *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 743 (7th Cir. 2010). Like here, the page the Seventh Circuit reviewed in *Janiga* included a clause that confirmed that the plaintiff had read, understood, and agreed to all terms of the contract, *including the arbitration agreement* contained on a separate page of the contract. *Id.* The court therefore concluded that an agreement to arbitrate was formed. *Id.* ("The problem for Janiga is that he signed a contract, and that the paper he signed refers to arbitration. Janiga's signature—which he admits was given voluntarily—objectively demonstrated his assent to the contract.").

Amato cites no binding authority that directly supports his argument. Earlier in his response, he cites *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 873 (7th Cir. 1985), and *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003). But as Amato himself states, these cases relate to conflicts between agreements that contained an arbitration provision and those that did not—not conflicts between a fully executed agreement to arbitrate and one that (according to Amato) is not fully executed and thus not "properly incorporated into the agreement of the parties." Pl.'s Resp. at 10.

The Court therefore concludes, as a matter of law, that both the June Buyer's Order and the June RIC contain arbitration provisions by which Amato agreed to be bound. Although the Court's analysis could end there, it will turn next to Amato's contention that the August RIC *also* did not create an enforceable agreement to

arbitrate because it was forged.

## B.    The August RIC

Amato next contends that the August RIC superseded the June RIC because "the August RISC has inconsistencies with the June RISC—not the least of which having someone else's signature—but also insomuch as it contains materially different financing terms."  *Id*. at 11-12.  Amato further contends that the August RIC is a forgery and thus "utterly enforceable," and thus the agreement to arbitrate found within it is unenforceable as well.  *Id.* at 14.  Amato also contends that his conduct post-August RIC is inconsistent with an intent to ratify that agreement.  Finally, he contends—in the alternative—that the issues of ratification and forgery involve disputed facts that require a trial.  The defendants contend that there is no genuine factual dispute regarding either the alleged forgery of the August RIC or Amato's ratification of the August RIC through his conduct.[6]

Amato poses the following question to the Court: "[i]f the modified terms in the form of the August RISC was not actually signed by [him] . . . how then does the court

_____

[6] The defendants argue that Amato's belated contention that the August RIC is a forgery lacks merit and cannot create a genuine dispute of fact because his "judicial admissions, sworn statements and other undisputed facts relating to his conduct all confirm that Amato is bound by and assented to the terms of the August RIC, including the arbitration clause therein."  Defs.' Reply at 2.  And regarding ratification, the defendants point to the following conduct that they contend displays an intent to assent to the terms of the RIC and an acknowledgement of its validity: Amato attached the August RIC to his complaints and alleged that it was the source of certain obligations that he alleges were breached; he continued to retain possession of the vehicle and make regular payments to U.S. Bank even *after* he received a copy of the allegedly forged August RIC; and he not only failed to mention (in his December revocation notice) that he believed that the August RIC was forged but also requested "payoff in the amounts outstanding *which are due* under the [August] *retail installment contract*." Defs.' Resp., Ex. D (emphasis added).

reconcile the issue of enforceability of certain provisions, such as the disputed Arbitration Provision at issue in the instant motion?"  *Id*. at 12.  The answer to that question is straightforward and already proposed by Amato himself throughout his response and during oral arguments, namely, that the August RIC simply would be invalid.

In other words, the Court need not determine whether the August RIC is indeed a forgery or if Amato assented to that agreement by conduct.  Why?  Because even if the Court or a jury were to conclude that the August RIC is a forgery and thus unenforceable—and/or that Amato did not ratify the agreement via his conduct—all that would accomplish would be to invalidate the August RIC.  For Amato, these arguments run in tandem with his contention that the June transactions *also* did not result in a binding agreement to arbitrate.  But as the Court has discussed, that contention lacks merit:  both the June Buyer's Order and the June RIC contain arbitration provisions by which Amato agreed to be bound.

Because the parties had an enforceable contract that, as discussed previously, included an arbitration provision, the Court must grant the motion to compel arbitration.

## C.    Public policy

Finally, Amato contends that the defendants' motion to compel arbitration contravenes public policy because it "seek[s] to enforce an arbitration agreement to mitigate, prevent and or prohibit the disclosure of information related to an illegal fraudulent scheme that arguably violates the federal wire fraud statute."  *Id*. at 7.

The Court is not persuaded that compelling arbitration of Amato's claims would run afoul of public policy.  As Amato himself states, "[i]n evaluating whether a contract

12

violates public policy, courts must determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest." *Id*. at 16 (citing *O'Hara v. Algren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 342, 537 N.E.2d 730, 734 (1989)). No such threat of harm is posed by the arbitration agreements at issue. As Amato point out, the agreements at issue do not contain confidentiality provisions. Nor is the Court persuaded that Amato's claims regarding the defendants' allegedly fraudulent scheme cannot be adjudicated just as efficiently and fairly in arbitration proceedings as they could be adjudicated before this Court.

Moreover, Amato concedes that "it is well settled public policy that Illinois actively favors arbitration agreements." Pl.'s Resp. at 16. The same is true at the federal level. *See KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (the FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution."); *see also*, *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc*., 174 F.3d 907, 909 (7th Cir. 1999) ("The Supreme Court has explained that the FAA 'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24–25 (1983)).

The Court therefore overrules Amato's contention that the arbitration agreements at issue in this case are unenforceable as a matter of public policy.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motion to stay these proceedings and to compel arbitration [dkt. nos. 25 and 41]. Because the case will be pending before an arbitrator for the foreseeable future, the Clerk is directed to

administratively terminate the case.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 30, 2023